# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**JOSEPH SEALS III**
       **Plaintiff,**

    **v.**                                      **Case No. 19-C-1244**

**ANDREW M. SAUL,**
**Commissioner of the Social Security Administration**
                **Defendant.**

---

## DECISION AND ORDER

Plaintiff Joseph Seals, a U.S. Army veteran, suffers from post-traumatic stress disorder ("PTSD"), depression, and anxiety related to his military service in Iraq. The Department of Veterans Affairs ("VA") found him disabled, awarding VA pension benefits, but the Social Security Administration reached a different conclusion on plaintiff's application for disability insurance benefits. Specifically, the social security Administrative Law Judge ("ALJ") assigned to the case found that plaintiff could, despite his severe mental impairments, still perform a range of unskilled, simple work. Plaintiff seeks judicial review of the ALJ's decision. For the reasons that follow, I remand for further proceedings.

## I. LEGAL STANDARDS

### A. Disability Standard

In determining whether a claimant is disabled, the ALJ applies a five-step, sequential test. 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ determines whether the claimant is engaging in "substantial gainful activity" ("SGA"). Id. 404.1520(a)(4)(i). If not, at step two the ALJ determines whether the claimant suffers from any "severe" impairments. Id. §

404.1520(a)(4)(ii). An impairment is severe if it significantly limits the claimant's physical or mental ability to do basic work activities. Id. § 404.1520(c).

If the claimant has a severe impairment or impairments, at step three the ALJ decides whether any of those impairments, alone or in combination, qualify as conclusively disabling under the agency's "Listings." Id. §§ 404.1520(a)(4)(iii), (d). To meet or equal a Listing, "the claimant must satisfy all of the criteria of the listed impairment." Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999). As is pertinent here, the mental impairment Listings related to depression and anxiety are met if the claimant demonstrates at least two "marked" limitations or one "extreme" limitation under the "paragraph B" criteria: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself.[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06.[2]

If the impairment(s) do not meet or equal a Listing, at step four the ALJ determines whether the claimant can, given his "residual functional capacity" ("RFC"), perform his past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), (e) & (f). RFC is an assessment of the claimant's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis, i.e., eight hours a day, for five days a week, or an equivalent

---

[1]The agency revised the paragraph B criteria in January 2017. Previously, those criteria were (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. See Charles M. v. Saul, No. 18 C 6949, 2020 U.S. Dist. LEXIS 6573, at *10 n.5 (N.D. Ill. Jan. 15, 2020).

[2]On the other hand, if the ALJ rates the degree of impairment as "none" or "mild," he will generally conclude that the impairment is not severe. 20 C.F.R. § 404.1520a(d)(1). If the ALJ finds that the claimant has a severe mental impairment that does not satisfy a Listing, e.g., if the degree of impairment is "moderate," he must then assess the claimant's mental residual functional capacity. Id. § 404.1520a(d)(3).

2

work schedule.  SSR 96-8p, 1996 SSR LEXIS 5, at *1.

Finally, if the claimant cannot perform past work, at step five the ALJ considers whether he can, given his age, education, work experience, and RFC, perform other jobs existing in significant numbers in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(v), (g). "The claimant bears the burden of proof at steps one through four, after which at step five the burden shifts to the Commissioner." Briscoe v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005). "The Commissioner typically uses a vocational expert ('VE') to assess whether there are a significant number of jobs in the national economy that the claimant can do." Liskowitz v. Astrue, 559 F.3d 736, 743 (7th Cir. 2009).

**B.    Judicial Review**

The reviewing court will reverse if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence. Martin v. Saul, 950 F.3d 369, 373 (7th Cir. 2020). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id.  The court may not, under this deferential standard, replace the ALJ's judgment with its own by reconsidering facts, re-weighing or resolving conflicts in the evidence, or deciding questions of credibility. Jeske v. Saul, 955 F.3d 583, 587 (7th Cir. 2020).

But this does mean that the court simply rubber-stamps the ALJ's decision without a critical review of the evidence. Minnick v. Colvin, 775 F.3d 929, 935 (7th Cir. 2015).  The court must review the entire record, considering both the evidence that supports, as well as the evidence that detracts from, the ALJ's decision. Briscoe, 425 F.3d at 351.  The court may not uphold an ALJ's decision, even if there is enough evidence in the record to support it, if the decision fails to provide an accurate and logical bridge between the evidence and the result,

3

Blakes v. Barnhart, 331 F.3d 565, 569 (7ᵗʰ Cir. 2003), fails to consider important evidence, Brindisi v. Barnhart, 315 F.3d 783, 786-87 (7ᵗʰ Cir. 2003), or rests upon flawed logic or serious errors in reasoning, Indoranto v. Barnhart, 374 F.3d 470, 475 (7ᵗʰ Cir.2004). Finally, judicial review is limited to the ALJ's rationales; the court will not uphold an ALJ's decision by giving it different ground to stand upon. Jeske, 955 F.3d at 587 (citing SEC v. Chenery Corp., 318 U.S. 80, 93-95 (1943)).

## II. FACTS AND BACKGROUND

### A. Plaintiff's Application

Plaintiff filed the instant application for social security benefits on January 23, 2014, alleging disability based on PTSD, anxiety, and depression, with an onset date of December 12, 2012. (Tr. at 16, 69, 85, 210, 235.) He reported past work as a security guard from 2000 to 2008 (Tr. at 236), and the agency determined that he remained in "insured status" through September 30, 2013 (Tr. at 18, 86, 231). This meant that he needed to establish disability between December 12, 2012, and September 30, 2013, in order to receive benefits.

### B. VA Medical Opinions & Evidence

The record contains a number of medical opinions from treating and examining medical sources at the VA. Plaintiff was initially awarded a 50% disability rating through the VA in 2007, which was then increased to 70% in 2009 and 100% in 2016. (Tr. at 289-91, 470.)

Following a March 23, 2009, review examination, Phillip Ruppert, Psy.D., diagnosed plaintiff with PTSD and secondary depression, resulting in moderate impairment in social/vocational functioning. (Tr. at 595.) During his mental status exam, Dr. Ruppert noted deficits in attention and concentration, short-term recall, and social judgment. (Tr. at 595.)

4

Following a September 28, 2009, review examination, Gregory Simons, Ph.D., found that plaintiff met the criteria for PTSD, with his symptoms worsening since the previous evaluation in March 2009. (Tr. at 588.) Dr. Simons noted a GAF ("Global Assessment of Functioning") score of 38, denoting serious social and occupational impairment. (Tr. at 589.)

Plaintiff primarily treated with Polina Kaplunsky, M.D., a psychiatrist, at the VA. In a September 2009 letter, Dr. Kuplunsky indicated that plaintiff's anxiety and depressive symptoms had recently worsened; he experienced re-surfacing of nightmares, flashbacks, and distressing memories related to his service. He also reported exacerbation of avoidance and hyperarousal symptoms (avoidance of crowds, people, distancing from others, hypervigilance, heightened startle and physiological responses). She concluded that his "ability to maintain gainful employment or fulfilling relationship[s] diminished." (Tr. at 289.)

Focusing on the treatment records from around the relevant period, on October 31, 2012, Dr. Kaplunsky noted that she continued to treat plaintiff for alcohol dependence, PTSD, and mood disorder. Despite reporting compliance with his medications, plaintiff complained of worsening depression. On mental status exam, he was alert and oriented, with a sad mood, congruent affect, and linear and goal directed thought processes. (Tr. at 353.) She continued his medications, including Prazosin, Buspar, and Paroxetine, and added Remeron. (Tr. at 354.) She also referred him for individual treatment (Tr. at 354-55), but he did not respond to follow up messages (Tr. at 352).

On April 2, 2013, plaintiff told Dr. Kaplunsky that he continued to experience depressive symptoms, decreased level of motivation, and intrusive symptoms of PTSD. (Tr. at 348-49.) On mental status exam, he was alert and oriented, with depressed mood, congruent affect, and linear and goal directed thought processes. (Tr. at 349.) Dr. Kuplunsky assessed alcohol

5

dependence, PTSD, mood disorder, and cannabis dependence. She recommended he abstain from alcohol and marijuana; continued Prazosin, Buspar, Paroxetine, and Remeron; and referred him for individual treatment of PTSD. (Tr. at 350.) He again did not respond to follow up regarding this treatment. (Tr. at 347.)

On July 10, 2013, plaintiff told Dr. Kaplunsky that he relapsed two weeks ago after being abstinent for six weeks, explaining that he "can't deal with life while sober." (Tr. at 344.) He continued to struggle with intrusive and hyperarousal symptoms of PTSD. On mental status exam, he was alert and oriented, with dysphoric affect, linear and goal directed thought processes, and limited to poor insight and judgment. (Tr. at 344.)

On September 11, 2013, plaintiff complained of worsening anxiety and re-surfacing of nightmares. (Tr. at 341.) He admitted ongoing alcohol and THC use. On mental status exam, he was alert and oriented, with concerned and worried mood, constricted affect, linear and goal directed thought processes. (Tr. at 342.) Dr. Kuplunsky again recommended he stop alcohol and marijuana use; continued Prazosin, Buspar, Paroxetine, and Remeron; and encouraged him to attend PTSD treatment or participate in yoga class. (Tr. at 343.)

On November 27, 2013, plaintiff reported inconsistent sleep with occasional nightmares, and continued avoidance and hyperarousal symptoms. He indicated that transportation issues prevented him from attending group treatment, and that lack of childcare also negatively influenced his performance in an academic program in which he had enrolled. On mental status exam, he was alert and oriented, with fine mood, guarded affect, and linear and goal directed thought processes. (Tr. at 337.)

On January 8, 2014, plaintiff told Dr. Kuplunsky that some days his medications worked, some days they did not. He described a period of depression and isolation during the holiday

season. He also reported ongoing alcohol use, indicating it relaxed him, but acknowledged negative effects, such as missed appointments and not doing household chores. He continued to experience intrusive symptoms, intense nightmares, and avoidance/hyperarousal symptoms. (Tr. at 333.) He continued to express reluctance to participate in the treatment. (Tr. at 334.)

On April 10, 2014, plaintiff reported compliance with current medications, with minimal beneficial effect. He related continuous presence of intrusive symptoms, such as nightmares, avoidance, and hyperarousal. On mental status exam, he was alert and oriented, with concerned mood, congruent affect, and linear and goal-directed thought processes, but insight and judgment were poor. (Tr. at 329.)

On April 17, 2014, James Hastings, Ph.D., a VA staff psychologist, completed a disability benefits questionnaire, listing diagnoses of PTSD, alcohol use disorder, and cannabis use disorder. (Tr. at 314.) Dr. Hastings indicated that plaintiff's reported symptoms of anxiety and arousal were related to the PTSD, and that his alcohol and cannabis use had the effect of masking his PTSD symptoms. He checked the box for "total occupational and social impairment." (Tr. at 315.) Dr. Hastings indicated that since the last evaluation in 2009, plaintiff and his wife had separated, he lived with one of his children, and he had a lady friend come by a few times per week to cook for him. (Tr. at 316.) He had tried to attend school at UWM in 2013 but found it too stressful and his grades were poor. He received medications at the VA but resisted counseling. He continued drinking and smoking marijuana. (Tr. at 317.) He experienced recurrent, involuntary, and intrusive distressing memories of traumatic events and marked psychological reactions to internal or external cues that symbolize or resemble an aspect of the traumatic events. He engaged in avoidance of stimuli associated with the traumatic events. (Tr. at 318.) He also demonstrated irritable behavior and angry outbursts,

7

hypervigilance, and problems with concentration. (Tr. at 319.) During the evaluation, he was polite and appropriate, neat, clean, and well groomed. He was alert and oriented, speech was well modulated and articulate, thinking was quick and clear, and all answers were relevant, logical, and fully elaborated. Insight and judgment seemed fair, and intelligence seemed average. Memory was intact for relevant history, though he did complain of some short term memory problems, due largely to inability to attend and concentrate or focus, especially in a school setting. He denied symptoms of thought disorder but complained of the full roster of PTSD symptoms. Affect was stable, perhaps a bit truncated. He reported feeling chronically edgy and tense when out, so he rarely went out, only to school for issues about his son and to Masonic lodge meetings once or twice monthly. He tried attending classes at UWM but felt hyperalert and vigilant in crowds, and felt very self-conscious and stigmatized there. He was chronically depressed, feeling useless and worthless. He continued drinking and smoking marijuana, and was not persuaded that it was harmful. He was also not persuaded that therapy would help and had not followed through on several referrals. "Bottom line: his condition seems no better; he remains withdrawn, largely isolated, marginally controlling his symptoms with licit and illicit drugs; and he remains unable to attend work or school to any useful degree." (Tr. at 320.)

On July 11, 2016, Dr. Matthew Vendlinski completed an additonal evaluation, covering the period since the last exam in April 2014, with plaintiff reporting that his functioning remained relatively unchanged. (Tr. at 1331-33.) Dr. Vendlinski opined that plaintiff's mental problems and related functional impairment remained largely unchanged, categorized as "unemployable." (Tr. at 1339.)

During subsequent treatment sessions with Dr. Kuplunsky from 2016-19, plaintiff

8

continued to report depressed mood, lack of motivation, ongoing nightmares, hyperarousal, and avoidance.  (Tr. at 1042, 1032, 1021-23.)  He did report that he stopped drinking in February 2017.  (Tr. at 1038.)

## C.    Agency Decisions

The agency denied the application initially on October 7, 2014 (Tr. at 92, 103) based on the review of Esther Lefevre, Ph.D. (Tr. at 84-91).  Dr. Lefevre evaluated the claim under Listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders).  Under the paragraph B criteria, Dr. Lefevre found mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration.  (Tr. at 87.)  In evaluating mental RFC, Dr. Lefevre determined that plaintiff was not significantly limited in the ability to carry out short and simple instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, sustain an ordinary routine, and make simple work-related decisions, but moderately limited in the ability to work in coordination with others, and complete a normal workday without interruptions from psychologically based symptoms and perform at a consistent pace without unreasonable breaks.  (Tr. at 89.)  Dr. Lefevre further concluded that plaintiff was markedly limited in the ability to interact with the general public and moderately limited in the ability to get along with coworkers.  (Tr. at 89-90.)

Plaintiff requested reconsideration (Tr. at 108), but the agency maintained the denial on April 1, 2015 (Tr. at 102, 109) based on the review of Jan Jacobson, Ph.D. (Tr. at 93-101).  Dr. Jacobson agreed with Dr. Lefevre's previous assessment of the paragraph B criteria (Tr. at 96) and mental RFC (Tr. at 98-99).  She explained that plaintiff was able to sustain attention for

9

simple, repetitive tasks for extended periods of two hour segments over the course of a routine workday and workweek within acceptable attention, concentration, persistence and pace tolerances. However, he was unable to do so for moderately detailed/complex tasks requiring sustained attention. Dr. Jacobson further explained that plaintiff was able to sustain the minimum social demands of simple task settings, including relating adequately to coworkers and supervisors, but could not deal directly with the general public. (Tr. at 99.)

Plaintiff requested a hearing before an ALJ (Tr. at 117), which was held on July 20, 2017 Tr. at 66). On August 16, 2017, the ALJ denied the claim (Tr. at 13, 769), and on December 5, 2017 the Appeals Council denied review (Tr. at 1, 787). Plaintiff sought judicial review, and on August 30, 2018, I granted the parties' joint motion to remand for further proceedings (Tr. at 758). On January 24, 2019, the Council remanded the case, instructing the ALJ to give further consideration to plaintiff's mental RFC, the medical source opinions, and plaintiff's alleged symptoms. (Tr. at 762-66)

**D.    Hearing**

On June 5, 2019, plaintiff appeared for his hearing on remand. (Tr. at 653.) The ALJ also summoned a VE to provide job information. (Tr. at 655.)

Plaintiff testified that he had a high school level education and currently lived alone, but in the 2012-13 period at issue he lived with his three children. (Tr. at 660.) His then-12 year old son lived with him full-time, the other two part-time. (Tr. at 661, 910.) He testified that he did not have a driver's license at that time, relying on cabs or rides from friends for transportation. (Tr. at 661.) He indicated that he could not, since returning from Iraq in 2007, take a city bus. (Tr. at 662.) He testified that, aside from his military service, he previously worked as a security guard and janitorial franchise owner. (Tr. at 662.)

10

Plaintiff testified that since returning from the middle east he found it difficult to transition back to civilian life. (Tr. at 666.) He could not deal with unfamiliar people or crowds (Tr. at 673); some days he could not leave his house (Tr. at 666). He could "just feel and smell Iraq some days." (Tr. at 666.) He also experienced periods of hypervigilance and temper issues. (Tr. at 673-75.) To avoid problems, he isolated. (Tr. at 675.) He reported problems in group settings and did better by himself. (Tr. at 676.) He also experienced flashbacks several times per week, which could be triggered by loud noises. (Tr. at 676-77.) He further experienced memory problems, forgetting things like doctors' appointments. (Tr. at 679.) He also experienced panic attacks four or five times per week, lasting 15-20 minutes. (Tr. at 679-80.) During these attacks he could not continue to function and needed to step away and isolate. (Tr. at 680.)

Plaintiff testified that he was prescribed medications by providers at the VA, which helped, mainly with sleep. (Tr. at 667.) He admitted that on returning from Iraq he also relied on alcohol and marijuana to get through the day. His providers encouraged him to stop, which he did in 2017. (Tr. at 668.) Plaintiff's providers also encouraged counseling, but he resisted because he did not like discussing his problems with others. (Tr. at 669-70.)

Plaintiff testified that his daily activities at that time were documented in his September 2014 function report, in which he indicated that he got his son up and off to school, listened to music, attended appointments and his kids' school activities, and did needed shopping. (Tr. at 670-73.) He went to church at times and attended meetings at his Masonic lodge with friends he felt comfortable around. (Tr. at 672.)

The ALJ then asked the VE a hypothetical question, assuming a person able to work at all exertional levels, but limited to unskilled work involving simple and routine jobs tasks; jobs

11

having no more than occasional decision making, changes in work setting, and interaction with coworkers and supervisors; and having no interaction with the public. (Tr. at 683-84.) The VE testified that such a person would not perform plaintiff's past work, which was done at the semi-skilled or skilled level. (Tr. at 684.) However, the person could do other jobs such as dishwasher, laundry worker, and machine feeder. (Tr. at 684-85.)

If the person needed two unscheduled breaks during the day, that would eliminate all competitive employment. (Tr. at 685.) Similarly, if the person had four or five "bad days" per month where he would be off-task up to a third of the day, the person could not maintain competitive employment. (Tr. at 687.) Nor would employers tolerate, more than once, an employee who had a dispute with a coworker or supervisor, walked away, and refused to talk to them. (Tr. at 687-88.) If the person needed a "worker-driven pace," where he would set the pace of work, the three cited jobs could not be performed. (Tr. at 688.) Finally, if the person needed to be isolated about a third of the time, there would be very few jobs; there would have to be some level of accommodation. (Tr. at 689.)

**E.     ALJ's Decision**

On June 24, 2019, the ALJ issued an unfavorable decision. (Tr. at 631.) Following the five-step process, the ALJ determined at step one that plaintiff had not engaged in substantial gainful activity from the alleged onset date of December 12, 2012, through the date last insured of September 30, 2013. (Tr. at 636.) At step two, he concluded that through the date last insured plaintiff had the severe impairments of PTSD, anxiety, affective disorder/depression, alcohol abuse, and marijuana abuse. (Tr. at 636.)

At step three, the ALJ concluded that plaintiff's mental impairments did not meet Listings 12.04 (depressive disorders), 12.06 (anxiety disorders), and 12.15 (trauma or stress related

12

disorders). In understanding, remembering, or applying information, the ALJ found a moderate limitation. Plaintiff alleged problems with remembering, completing tasks, and concentrating, but the ALJ concluded that the record allowed only a moderate limitation in this area. While plaintiff's psychiatrist observed that his mood, affect, insight, and judgment were impaired, she also noted that his thought processes were logical and goal-directed. In addition, at his April 2014 VA compensation and pension examination, he was attentive, his speech well-modulated and articulate, his thinking quick and clear, and all of his answers relevant, logical, and fully elaborated; his insight and judgment were fair, his intelligence appeared average, and his memory intact although he did complain of short-term memory problems. Finally, in a September 2014 function report, which he testified reflected his functioning during the relevant period, plaintiff indicated that he did not have problems with comprehension or following instructions. He also described activities that reflected reasonably good function in this area, such as caring for his son, managing money, and shopping in stores. (Tr. at 637.)

In interacting with others, the ALJ found moderate limitation. Plaintiff reported significant difficulties interacting with others, particularly with unfamiliar people and in crowded settings. He also described social isolation/withdrawal, irritability, problems controlling his anger, and hyperarousal/hypervigilance. However, the ALJ found that the record supported only a moderate limitation. At the April 2014 examination, plaintiff was polite, appropriate, neat, clean, well-groomed, and attentive, which suggested a capacity for positive and appropriate social interaction. Plaintiff also reported having friends he could call to drive him places and that he would see at Masonic lodge meetings, which confirmed that he possessed the ability to maintain relationships. Finally, while plaintiff's social activities were limited, he was able to engage in activities that required him to go out into the community. (Tr. at 637.) He shopped

13

and attended church, Masonic lodge meetings, and sporting events of his children. (Tr. at 638.)

With regard to concentrating, persisting, or maintaining pace, the ALJ found moderate limitation. Plaintiff endorsed trouble with sustaining focus and attention, seeing tasks through to completion, and keeping pace. However, the ALJ concluded that the record showed only moderate limitation. Plaintiff exhibited logical and goal-directed thoughts across psychiatric medication management appointments. Further, at the April 2014 examination, he was attentive, his thinking was quick and clear, and all of his answers were relevant, logical, and fully elaborated. Finally, his activities required some degree of concentration, persistence, or pace. For instance, he shopped, cared for his son, and managed money. (Tr. at 638.)

As for adapting or managing onself, the ALJ found moderate limitation. Plaintiff reported problems handling stress and change, regulating his emotions, and tending to his daily activities. Plaintiff's treating psychiatrist documented his use of substances to treat his mental health symptoms and recorded abnormal judgment, insight, mood, and affect across her examinations. However, his treatment was conservative, in that he did not participate in highly structured or intensive mental health treatment. Further, he was able to perform a range of daily activities. He was a single parent for his 12-year old son and had joint custody of his other children; he was able to contact a cab or friends to get around; and he attended Masonic lodge meetings, church and sporting events of his kids, shopped and managed money. (Tr. at 638.)

Prior to step four, the ALJ determined that plaintiff had to the RFC to perform work at all exertional levels but with the following nonexertional limitations: limited to jobs that are unskilled and involve simple and routine job tasks; limited to jobs having only occasional

14

decision making, changes in work setting, and interaction with coworkers and supervisors; and limited to jobs having no interaction with the public. (Tr. at 638-39.) In making this finding, the ALJ considered plaintiff's statements regarding his symptoms and the medical opinion evidence. (Tr. at 639.)

The ALJ first summarized plaintiff's claims. Plaintiff alleged that he could not work due to his mental health impairments, which affected his abilities to handle stress and change, remember, concentrate, complete tasks, and get along with others. In his September 2014 function report, plaintiff indicated that he spent a typical day getting his 12-year-old son off to school, sleeping, taking his medication, and listening to music. He indicated that he usually stayed at home because he did not like being around people. At the April 2014 VA pension examination, plaintiff reported that a friend came to his home and cooked for him a few times per week. He further stated that he attempted to return to college in the fall of 2013, but he found it too stressful and his grades were poor. He further stated that he infrequently attended counseling sessions as he doubted their efficacy. He stated that sometimes he had a hard time getting up in the morning to get his son off to school and that his uncle came over to help. He reported that he left home to attend meetings at the Masonic odge and address issues for his son at school. At the June 2019 hearing, plaintiff testified that since he returned from his tour of duty in Iraq he struggled to transition back to civilian life. (Tr. at 639.) He described difficulty managing his temper, interacting appropriately with others and being around crowds, receiving criticism or suggestions from others, working in a group, using public transportation, and handling stress. (Tr. at 639-40.) He testified that he used marijuana and alcohol to cope with his daily life. (Tr. at 640.)

The ALJ then summarized the medical evidence, which documented plaintiff's

15

diagnoses of depressive/affective disorders, anxiety disorder, and PTSD, and his reported symptoms of hypervigilance, flashbacks, nightmares, distressing memories, social withdrawal, low motivation, irritability, memory loss, and problems handling stress. Treatment consisted of medication managed through psychiatric care; he decline therapy expressing doubts about its efficacy, reluctance to share his experiences and emotions, the effectiveness of alcohol and marijuana in controlling his symptoms, and lack of time due to parenting responsibilities. (Tr. at 640.)

The ALJ explained that due to plaintiff's moderate limitations in understanding, remembering and applying information, and concentrating, persisting and maintaining pace, he limited plaintiff to jobs that are unskilled and involve simple and routine tasks. He further considered these moderate limitations, as well as plaintiff's moderate limitations in adapting or managing himself, by restricting him to jobs having only occasional decision making and occasional changes in the work setting. Finally, the ALJ accommodated plaintiff's moderate limitations in interacting with others, with the more significant problems being around unfamiliar people, by limiting him to occasional interaction with coworkers and supervisors, and no interaction with the public. (Tr. at 640.)

In considering plaintiff's credibility, the ALJ found that while plaintiff's impairments could reasonably be expected to cause the alleged symptoms, plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely consistent with the medical and other evidence of record. (Tr. at 640.) First, the ALJ concluded that the medical evidence failed to fully substantiate plaintiff's allegations. For instance, while plaintiff's psychiatrist observed that his mood, affect, insight, and judgment were impaired, she also noted that his thought processes were logical and goal-directed. (Tr. at 641.) In addition, at

16

the April 2014 examination, he was polite, appropriate, neat, clean, and attentive; his thinking was quick and clear; his intelligence appeared average and his memory was intact; and his affect was stable. (Tr. at 641.) Second, plaintiff acknowledged that his alcohol use contributed to his forgetfulness, and he continued to use substances despite admonitions from his providers. Third, plaintiff did not require inpatient hospitalization or similarly structured treatment, and he declined counseling. Finally, the ALJ concluded that plaintiff's activities, including caring for his son, shopping in stores, and attending church and Masonic lodge meetings, suggested that he was more functional than alleged. (Tr. at 641.)

As for the opinion evidence, the ALJ gave some weight to the opinions of the state agency psychological consultants, Drs. Jacobson and Lefevre, finding them overall consistent with the medical evidence and plaintiff's activities. (Tr. at 641-42.) The ALJ discounted Dr. Lefevre's opinion that plaintiff could perform detailed instructions, as it conflicted with the evidence of plaintiff's symptoms and functional limitations. However, the ALJ found plaintiff's capacity for performing short and simple instructions within customary tolerances, as provided in Dr. Jacobson's narrative, consistent with the evidence of record and with the RFC for unskilled jobs involving simple and routine tasks. (Tr. at 642.)

The ALJ gave little weight to the April 2014 opinion from Dr. Hastings that plaintiff remained unable to attend work or school to any useful degree. The ALJ stated that Dr. Hastings rendered this opinion after the date last insured, that the opinion conflicted with the doctor's clinical examination findings, that the opinion was inconsistent with plaintiff's activities, and that the assessment was vague and arguably infringed on an issue reserved to the Commissioner. (Tr. at 643.) For similar reasons, the ALJ gave little weight to the July 2016 opinion from Dr. Vendlinski, that the severity of plaintiff's mental impairment had not changed,

17

that he had total occupational and social impairment, and that he was unemployable. (Tr. at 643-44.) The ALJ further gave little weight to the September 2009 opinion from Dr. Kaplunsky, plaintiff's treating psychiatrist, that plaintiff's ability to maintain gainful employment or fulfilling relationships had diminished. The ALJ stated that Dr. Kuplunsky rendered the opinion three years before the alleged onset date, that her statement was vague and conclusory, and that her statement opined on an issue reserved to the Commissioner. Finally, the ALJ gave little weight to the opinions of the compensation and pension examiners, Drs. Simons and Ruppert, who assessed moderate to serious impairment in social and vocational functioning. The ALJ explained that, like Dr. Kuplunsky, these opinions were issued prior to the onset date, were vague and conclusory, and considered an issue reserved to the Commissioner. (Tr. at 644.)

At step four, the ALJ concluded that plaintiff could not perform his past relevant work as a security guard and owner/supervisor of a janitorial service, semi-skilled and skilled jobs. (Tr. at 645.) At step five, however, the ALJ found that plaintiff could perform other jobs as identified by the VE, including dishwasher, laundry worker, and machine feeder. (Tr. at 645-46.) He accordingly found plaintiff not disabled. (Tr. at 646.)

### III. DISCUSSION

#### A. Plaintiff's Statements

Plaintiff first argues that the ALJ erred in evaluating his statements regarding the severity of his symptoms. As the ALJ noted on his decision, symptom evaluation is a two step process. (Tr. at 639.) First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2016 SSR LEXIS 4, at *5. Second, if the claimant has such an impairment, the

18

ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to work. Id. at *9. If the statements are not substantiated by objective medical evidence, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record and considering a variety of factors, including the claimant's daily activities, factors that precipitate and aggravate the symptoms, and the treatment he has received for relief of the symptoms. Id. at *18-19. The ALJ must then provide specific reasons for his finding, consistent with the regulatory factors and supported by the evidence in the record. Craft v. Astrue, 539 F.3d 668, 678 (7th Cir. 2008). On review, the court affords considerable deference to the ALJ's finding, reversing only if it is "patently wrong." Ray v. Berryhill, 915 F.3d 486, 490 (7th Cir. 2019).

In the present case, the ALJ found plaintiff's statements "not entirely consistent" with the evidence of record (Tr. at 640), indicating that the medical evidence failed to fully substantiate plaintiff's allegations; that plaintiff's alcohol use may have contributed to his memory problems; that plaintiff did not require inpatient hospitalization or similarly structured treatment; and that his daily activities showed that he was more functional than alleged (Tr. at 641). Despite the deference owed the ALJ's determination, these reasons do not withstand scrutiny.

First, as the ALJ himself acknowledged, plaintiff's symptoms were well documented in the medical record. (Tr. at 640.) The symptoms persisted, despite his compliance with medication. (See Tr. at 348-49.) The ALJ contrasted these reports with notations of logical thought processes, neat and clean presentation, and average intelligence, but the ALJ failed to explain how these mental status findings undercut plaintiff's primary complaints of hypervigilance, social withdrawal, and panic attacks.

Second, the ALJ faulted plaintiff for his drinking and marijuana use, which continued

19

despite the admonitions of his providers. Again, however, the ALJ failed to explain how this undercut the credibility of plaintiff's primary claims. Indeed, plaintiff stated that he used these substances to address his PTSD symptoms.

Third, the ALJ noted that plaintiff did not require in-patient treatment. While it is appropriate for an ALJ to consider a claimant's level of treatment, as the Seventh Circuit has noted, the "institutionalization of the mentally ill is generally reserved for persons who are suicidal, otherwise violent, demented, or (for whatever reason) incapable of taking even elementary care of themselves." Voigt v. Colvin, 781 F.3d 871, 876 (7th Cir. 2015). It does not follow that a person who avoids that level of care is capable of gainful employment. Id.

Finally, the ALJ relied on plaintiff's activities. Although it is also appropriate for an ALJ to consider a claimant's daily activities when evaluating credibility, "this must be done with care." Roddy v. Astrue, 705 F.3d 631, 639 (7th Cir. 2013). The Seventh Circuit has repeatedly cautioned that a person's ability to perform daily activities does not necessarily translate into an ability to work full-time. Id. The court of appeals has specifically warned against reliance on child care, noting that parents must take care of their children (or else abandon them to foster care) and that the flexibility possible in caring for children does not compare to the more rigid demands of the workplace. Gentle v. Barnhart, 430 F.3d 865, 867 (7th Cir. 2005). Here, in addition to relying on plaintiff's care for his 12-year old son, the ALJ mentioned a number of other activities, but none seem comparable to work. See Gaylor v. Astrue, 292 Fed. Appx. 506, 514 (7th Cir. 2008) ("Here, the ALJ did not explain why activities such as visiting family, shopping, and going to church contradict the conclusion of mental impairment by doctors examining the same lifestyle."). Perhaps plaintiff's attendance of Masonic lodge meetings could be seen as undercutting his claims of isolation and social withdrawal, but plaintiff

20

explained that he felt comfortable attending these meetings with his few close friends. (Tr. at 672.) It is hard to see how this would compare with the workplace. The matter must be remanded for reconsideration of plaintiff's credibility.

**B. CPP**

Plaintiff next argues that the ALJ failed to account for his limitations in concentration, persistence, and pace ("CPP"). The Seventh Circuit has emphasized that both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record, including even moderate limitations in CPP. Crump v. Saul, 932 F.3d 567, 570 (7th Cir. 2019). While the ALJ need not use the specific words "concentration, persistence, and pace," he must ensure that the VE is apprised fully of the claimant's limitations so that the VE can exclude those jobs that the claimant would be unable to perform. Id. The court of appeals had further indicated that the ALJ may not assume that a limitation to "unskilled work" or "simple, repetitive tasks" will account for CPP limitations. Id. This is so because the ability to perform tasks of a given complexity says nothing about whether the claimant can do so on a sustained basis, e.g., over the course of a standard eight-hour work shift. Id. "When the ALJ supplies a deficient basis for the VE to evaluate the claimant's impairments, this error necessarily calls into doubt the VE's ensuing assessment of available jobs." Id.

Here, the ALJ found a moderate limitation in CPP at step three, then crafted an RFC for unskilled work involving simple and routine job tasks; occasional decision making, changes in work setting, and interaction with coworkers and supervisors; and no interaction with the public. (Tr. at 638-39.) The Seventh Circuit has found similar formulations deficient. See, e.g., Crump, 932 F.3d at 569-70 (finding that RFC for "simple, routine, repetitive tasks with few

21

workplace changes" failed to account for moderate limitations in CPP); Varga v. Colvin, 794 F.3d 809, 815 (7ᵗʰ Cir. 2015) (noting that limitation on workplace changes and interaction with others "deals largely with workplace adaptation, rather than concentration, pace, or persistence."); Yurt v. Colvin, 758 F.3d 850, 858-59 (7ᵗʰ Cir. 2014) ("[W]e have repeatedly rejected the notion that a hypothetical like the one here confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace.").

To be sure, the Seventh Circuit has not adopted a rule of automatic reversal whenever the ALJ fails to use the "magic words." The court has in recent cases affirmed where the ALJ explained how his "alternate phrasing" accounted for the claimant's CPP limitations, see, e.g., Martin, 950 F.3d at 374; where the CPP limitations were context or task specific, or related to a particular type of impairment, and the RFC restricted the claimant from situations likely to trigger the symptoms, see, e.g., Jozefyk v. Berryhill, 923 F.3d 492, 498 (7th Cir. 2019); and where the ALJ reasonably relied upon the opinion of a medical expert who "translated" CPP findings into an RFC determination, see, e.g., Burmester v. Berryhill, 920 F.3d 507, 511 (7ᵗʰ Cir. 2019).³ The court has also found CPP errors harmless in cases where the claimant failed to identify the additional limitations the ALJ should have included. See Jozefyk, 923 F.3d at 498.

The Commissioner notes that in this case the ALJ relied on Dr. Jacobson's narrative opinion. "But even if an ALJ may rely on a narrative explanation, the ALJ still must adequately

---

³In some cases, the Seventh Circuit has "assumed a VE's familiarity with a claimant's limitations, despite any gaps in the hypothetical, when the record shows that the VE independently reviewed the medical record or heard testimony directly addressing those limitations." O'Connor-Spinner v. Astrue, 627 F.3d 614, 619 (7ᵗʰ Cir. 2010). That exception does not apply here.

22

account for limitations identified elsewhere in the record, including specific questions raised in [the earlier] sections of standardized forms such as the PRT and MRFC forms." DeCamp v. Berryhill, 916 F.3d 671, 676 (7th Cir. 2019). As indicated above, in the present case both Drs. Jacobson and Lefevre endorsed a number of moderate limitations in the earlier sections of their reports. Burmester, the case upon which the Commissioner primarily relies, involved the narrative opinion of a consultative examiner, whose report did not such contain such antecedent findings. 920 F.3d at 511-12 (distinguishing DeCamp on this basis).

This is not to suggest that an ALJ may never rely on the narrative explanation of a non-examining consultant under these circumstances.[4] However, the ALJ's explanation here leaves doubt as to whether the RFC captures all of plaintiff's specific limitations. In endorsing the narrative, the ALJ relied on the same pieces of evidence he cited in the credibility finding: logical and goal directed thoughts; attentive, articulate speech and average intelligence; and plaintiff's activities, including shopping and managing money. (Tr. at 642-43.) It is unclear how this evidence relates to plaintiff's ability to maintain the persistence and pace needed for regular, full-time work, given the specific nature of his impairment.

Citing Jozefyk, the Commissioner also argues that plaintiff fails to articulate what additional limitations were necessary to accommodate his moderate CPP limitations. But as plaintiff notes in reply, he identified a number of potential limitations related to hypervigilance, distractability, social avoidance, isolation, and panic attacks. (Pl.'s Rep. Br. at 7.) The ALJ

---

[4]Plaintiff argues that Dr. Jacobson lacks the background and training needed to offer an opinion on "acceptable tolerances." However, he cites no authority suggesting that a medical expert may not offer an opinion on this issue. See 20 C.F.R. § 404.1527(a)(1) (setting forth the appropriate subjects of a medical opinion); 20 C.F.R. § 404.1513a(b)(1) (noting that "agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation").

need not accept any or all of these limitations, but the matter must be remanded for further evaluation.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and this matter is remanded for further proceedings consistent with this decision.  The clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 2nd day of September, 2020.

s/ Lynn Adelman
LYNN ADELMAN
District Judge

24